UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number: 19-CV-81252-Cannon/Reinhart

RYAN SEGEV,

                    Plaintiff,

v.

LYNN UNIVERSITY, INC., et al.,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NO. 72, 74)

Presently before the Court are the Defendants' Motions for Summary Judgment (ECF No. 72, 74) which were referred by the district judge to the undersigned for appropriate disposition. ECF No. 113.  I have reviewed the Second Amended Complaint (SAC), which alleges six counts against Defendant Lynn University (Lynn).  They are: violations of Section 504 of the Rehabilitation Act (29 U.S.C. § 794) (Count I) and the Americans with Disabilities Act (ADA) (42 U.S.C. § 12182) (Count II), as well as claims for breach of contract (Count III), breach of the covenant of good faith and fair dealing (Count IV), negligence (Count VII), and negligent hiring training, supervising, and retention (Count XI).  ECF No. 51.  The SAC alleges two causes of action against Defendant Catherine Wharton for fraud (Count VI) and negligence (Count IX), as well as a negligence claim against Defendant Matthew Roche (Count X).[1]

---

[1]  Plaintiff voluntarily dismissed the two claims brought against Defendant Miguel Antunes (Counts V and VIII).  ECF No. 63, 69.

In addition to the motions and the SAC, I have reviewed Plaintiff's responses, Defendants' replies, and Plaintiff's sur-reply (ECF No. 89, 90, 98, 99, 112), as well as the parties' competing Statements of Material Facts ("SOF") (ECF No. 75, 88, 100, 111).

For the reasons explained below, I **RECOMMEND** that (1) Defendant Lynn University's Motion for Summary Judgment (ECF No. 74) be **DENIED** as to Counts I, II, III, and IV and be **GRANTED** as to Counts VII and XI;  (2) Defendant Matthew Roche's Motion for Summary Judgment (ECF No. 74) on Count X be **GRANTED**; and (3) Defendant Catherine Wharton's Motion for Summary Judgment (ECF No. 72) on Counts VI and IX, and as to the punitive damages sought against her, be **DENIED**.

## UNDISPUTED MATERIAL FACTS

Plaintiff Ryan Segev enrolled as a student at Lynn, a private university that receives federal funding, in the Fall of 2017.  SOF at ¶¶ 1,2 (ECF No. 75, 88).  In his application for admission, Segev checked a box indicating that he "intend[ed] to utilize the support services program for students with diagnosed learning disabilities," known as the Institute for Achievement and Learning (IAL), which required him "to send a recent psycho-educational evaluation."  ECF No. 88-12 at 3.  The cost of participating in IAL for the 2017-18 academic year was $11,750, in addition to tuition.  *See* Plaintiff's Additional Statement of Facts (ASOF) at ¶ 140 (ECF No. 88, 100).  According to Lynn's ADA Coordinator, Defendant Matthew Roche, who was responsible for final approval of all ADA accommodations, by checking this box on his application, Segev would have "trigger[ed] a notice to the IAL that there was an incoming student with a disability . . . [which] would trigger the university's response at that point."  *See* Defendants' Reply to Plaintiff's ASOF at ¶ 74 (ECF No. 100); *see also* Roche Declaration at ¶ 4 (ECF No. 75-6).

On August 28, 2017, Segev received an email from Lynn regarding his decision to join the IAL which stated, "As of this date, we have NOT yet received your psychological evaluation OR found it insufficient for us to conclude this process. Please [email] your current evaluation immediately to Paula Hyman," an administrative assistant at the school.  SOF at ¶ 12.[2]

Segev did not email his psychological evaluation to Ms. Hyman, but that same day, Segev's mother sent his psychological evaluation to Miguel Antunes, Segev's admissions officer.  SOF at ¶¶ 13-14.  On August 30, 2017, Antunes emailed Defendant Catherine Wharton, Lynn's Director of Diagnostic Testing Center for the IAL.  The subject line stated, "New Students – IAL" and the email included the names and student identification numbers for Segev and another student.  The email stated, "HI Catherine[,] These two are definitely coming, just wanted to give you Ryan's testing and ask if you'd happen to know who their academic advisor is?"  ECF No. 88-6 at 3.[3] Wharton responded the following day, "Hi Miguel, Yes, these students are assigned coaching and I will evaluate their testing and as soon as I can. Regards, Catherine."  *Id.*[4]  On September 22, 2017, Wharton emailed Segev's IAL academic coach, Natalie Capiro, stating that Segev had not yet submitted his psychological testing.  ECF No. 88-15.

---

[2]  Plaintiff claims that this fact is disputed because "the email did not specify that [his] psychological evaluation was needed for ADA accommodations."  ECF No. 75-7 at 2.  I reject this claim.  The email speaks for itself.  Plaintiff's argument does not contradict the content of the email, it merely seeks to contextualize it by adding additional facts.  No genuine factual dispute exists.

[3]  The phrases "psychological testing" and "psychological evaluation" are used interchangeably in the record.

[4]  It is unclear whether Auntues' email to Wharton actually attached Segev's psychological evaluation.  SOF at ¶ 18.  Plaintiff contends that Antunes forwarded the evaluation to Wharton and cites her deposition (ECF No. 88-4 at 2), but that page of the transcript does not reflect such testimony.

Capiro attempted to contact Segev on numerous occasions to schedule coaching sessions with Segev, but he did not respond. SOF at ¶¶ 17, 20-28. Segev's first coaching session with Capiro was on October 23, 2017. SOF at ¶ 29. During their coaching sessions in late October and early November 2017, Capiro discussed with Segev the importance of receiving his psychological testing. SOF at ¶ 32. On November 6, 2017, Segev's mother sent his psychological evaluation to Capiro. SOF at ¶ 33. On November 10, 2017, Capiro forwarded it to Paula Hyman. SOF at ¶ 34.

On December 27, 2017, Segev was placed on academic probation due to his poor performance in his first semester at Lynn. ASOF at ¶ 86 (ECF No. 88, 100).

On January 9, 2018, Paula Hyman went into Wharton's office and told her that Segev's evaluation had been sitting in their digital filing system since November. ECF No. 75-3 at 6-7. Wharton immediately reviewed Segev's psychological evaluation and recommended that he receive ADA accommodations. SOF at ¶ 36. Specifically, Wharton generated a list recommending that Segev receive extended time for testing, an alternative testing environment, an accommodation to address his dysgraphia (possibly a notetaker), and assistive technology, such as speech-to-text. ECF No. 88-4 at 15, 17. She gave the list to Paula Hyman to put in their digital file, and also brought a copy to Capiro. *Id.* at 15. Even though Segev's accommodations had not yet been granted, Wharton believed that having the list "would have allowed [Capiro] to be more informed to have a conversation about academic accommodations" with Segev. *Id.* at 16. Wharton testified that she "did not have the authority to grant accommodations without anyone else's permission . . . Matt Roche did final approval of them." ECF No. 75-3 at 5.

Wharton testified that on January 9, 2018, she went to the office of the ADA Coordinator, Matthew Roche, and notified him verbally about the delay in granting Segev's accommodations because she "felt like it was a big mistake" – one that "could not put him in a particularly good

light." *Id.* at 15, 18-21.   Wharton did not bring Roche the list of her recommended accommodations.  ECF No. 75-3 at 10.[5]  Roche does not recall this conversation with Wharton and states that he "had no knowledge about Plaintiff or his request for accommodations until March 16, 2018, when I formally approved his accommodations and sent them to his faculty members." *See* Roche Declaration at ¶¶ 6, 7 (ECF No. 75-6).

Although Segev's accommodations were granted by Roche on March 16, 2018, three of his professors refused to comply with them.  ASOF at ¶ 96 (citing Segev Dep. Tr. (ECF No. 88-7 at 8-12)).[6]  Segev also performed poorly in his second semester and on May 23, 2018, Segev received a letter advising him of his academic dismissal from Lynn.  ASOF at ¶ 98 (ECF No. 88, 100).

In June 2018, Segev emailed a document entitled "Academic Probation Appeal" to Diane DiCerbo, a professor at Lynn.  ECF No. 88-14 at 3-8.  In it, Segev states that he became interested in attending Lynn because of its reputation as being the "pinnacle of helping students with disabilities" and that "[t]o my understanding once school began I would have my accommodations and assistance which was the main reason for my attending Lynn in the first place." *Id.*  Segev detailed his learning disabilities and described how he believed Lynn had failed him.  He noted that he did not receive his "accommodations until late into my second semester, even when I had my psychological evaluation submitted from the beginning." *Id.*  Professor DiCerbo responded to Segev in an email dated June 9, 2018, that she was "quite confused."

---

[5]  Plaintiff disputes this fact and contends that Wharton testified that she hand-delivered a copy of her recommendations to Roche, however, Plaintiff's citations to Wharton's deposition transcript do not support this version of events.  *See* Plaintiff's ASOF at ¶ 38.

[6]  Defendants attempt to dispute this fact with statements by Roche and Capiro that Segev never reported his professor's non-compliance to them (ECF No. 100 at ¶ 96), however this is insufficient to create a disputed issue of fact.

> Your email stated nothing about your responsibility in not being successful in your classes and what you will be doing differently if granted an additional semester at Lynn to achieve the necessary grades to remain a student. I will allow you to write an appeal for your dismissal and extend the deadline until Friday, June 15th.

*Id.* at 8-9.

On August 3, 2018, Segev and his mother met with Wharton, who had been promoted to replace Roche that summer.  SOF at ¶ 53; ECF No. 75-6 at ¶ 1; ECF No. 88-8 at ¶¶ 3, 4.  During the meeting, Segev's mother suggested that Lynn wipe clean her son's academic record.  SOF at ¶ 54.[7]  Later that day, Wharton wrote an internal memorandum to Shaun Exsteen, the Executive Director of IAL, memorializing her meeting with Segev and his mother.  ECF No. 88-22 at 2.  She noted Segev's complaint that the "Appeals Committee overlooked [the] potential of civil rights violation," and she concluded the memorandum stating,

> My primary concern is that we may have violated his rights. He provided us with documentation 11/17/18. I think it could be argued that was "requesting accommodations" when he was communicating with faculty and the testing center[.]

*Id.*

On August 28, 2018, Segev signed Lynn's Academic Bankruptcy Form, which stated that "[a]n ACADEMIC BANKRUPTCY DECLARED notation will appear on your Lynn transcript, for each term/semester."  SOF at ¶ 59.

On September 11, 2018, Segev's mother wrote a letter to Lynn, recounting her recollection of the August 3rd meeting with Wharton.

> At this meeting Ryan and I clarified that we are asking for Ryan's first year of attendance be wiped so to give him the opportunity to restart this year with accommodations as well as his entry GPA from high school and for the tuition of last year to be credited towards this year. Catherine [Wharton] felt that was a fair request and guaranteed us that a resolution would be handled by the appropriate departments and that Ryan should have no further issues attending Lynn this year.

---

[7]   What transpired during the rest of that meeting is disputed by the parties, as is set forth below.

ECF No. 88-33.  In the letter, Segev's mother stated that in a call with Wharton earlier that day

she "outlined the numerous statutes and laws that have been disregarded and evaded in regards to

the U.S. Dept of Justice Civil Rights Division."  *Id.*  Segev and his mother believed that the

Academic Bankruptcy "would not reflect on Ryan's transcript and would be only an in-house

agreement."  *Id.*  Moreover, Segev and his mother subsequently learned that they would only

receive a partial ($5,000) tuition credit.  *Id.*

On September 27, 2018, Lorna Fink, Lynn's Compliance Officer, emailed Segev's mother.

ECF No. 88-11.  The email states in relevant part:

> I understand from you that Ryan may not have fully understood what he was
> agreeing to and that upon your review academic bankruptcy was not determined to
> be a reasonable resolution. As such, we are happy to reverse the academic
> bankruptcy and to offer full withdrawals for each course during the 2017-2018
> Academic Year. With this path, there will be no record on Ryan's transcripts of the
> grades received during the 2017-2018 academic year as you requested.

*Id.*

With regard to Segev's decision to leave Lynn after he enrolled in classes for the Fall 2018

semester, Fink advised that

> his absence from classes without withdrawing from the University has resulted in
> a balance of $9,058. Per the institution's refund policy . . . if Ryan withdraws today
> he is eligible for a 25% tuition refund totaling $4,495 leaving a remaining balance
> of $4,563. While I informed you that a decision to withhold your son from classes
> during the Fall 2018 term after all grievances impacting his current academic
> success had been rectified may result in financial and academic consequences, we
> are willing to make a rare exception in this case by reversing the charges for the fall
> resulting in a $9,440 credit remaining on your account.

*Id.*[8]  Segev testified that he and his mother rejected Fink's offer regarding his transcript because

of the "financial aspects."  ECF No. 75-2 at 19.  Segev subsequently withdrew from Lynn when

he learned that the University would not refund the money he previously paid for the 2017-18

---

[8] Fink's letter does not address Segev's request for a refund of the money he paid for the 2017-2018 academic year.

school year or apply those funds towards the new semester. ECF No. 75-2 at 16. Thereafter, Segev enrolled in Palm Beach State College to obtain a certification as a diesel technician. SOF at ¶ 67.

## LYNN'S PUBLICATIONS

Both Segev and the Defendants rely upon portions of Lynn's publications to support their claims and arguments. Excerpts of Lynn's Academic Catalog and Policy Manual are cited throughout the SAC and competing SOF, so I will include relevant portions here.

## 2017-2018 ACADEMIC CATALOG

Chapter VII of Lynn's Academic Catalog is entitled "Academic Support Services" and states in relevant part:

**Institute for Achievement and Learning [IAL]**

The Institute for Achievement and Learning provides innovative academic support services . . . the Institute offers diagnostic information and assessments, and a menu of comprehensive, and diverse support services . . . The Institute has been created as the vehicle to promote the idea of label-free learning . . . The Institute is the coordinating body for existing and new campus academic support services and the primary source for student support outside of classroom instruction. All students have access to the Institute, which includes the following resources and programs:

- The Diagnostic Center for Educational Assessment: The Institute's diagnostic branch exists to further illuminate student strengths and weaknesses . . .

- Lynn University Institute for Achievement and Learning Tutoring Program: The program is designed to assist all Lynn University students with course work by offering individual and content-area tutoring and use of the Institute staffed writing center . . .

- The Comprehensive Support Program component of the Institute is a fee-based program that requires students to submit documentation of their learning difference at the time of their application to Lynn . . . The services include coaching, tutoring, and registration into Institute Fellows courses. These services are staffed by experts in the field of working with students with learning challenges.

- ADA Office: Available to students who qualify for special accommodations for learning and testing.

\*      \*      \*

> In accordance with the university's mission as well as applicable federal and state laws, Lynn University is committed to providing equal access and participation educational opportunities for all, qualified students with documented disabilities through the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.

ECF No. 88-27 at 3-4.

A footnote on the first page of Lynn's Academic Catalog states as follows:

> **Please Be Advised:** The contents of this catalog represent the most current information available at the time of publication. However, during the period of time covered by this catalog, it is reasonable to expect changes to be made with respect to this information without prior notice. The course offerings and requirements of Lynn University are under continual examination and revision. Thus, <u>the provisions of this catalog are not to be regarded as an irrevocable contract between the University (or any of its colleges or schools) and the student</u>.

ECF No. 75-1 at 5 (emphasis added).

## <u>LYNN'S POLICY MANUAL</u>

Volume II of Lynn's Policy Manual, entitled "Community Policies," begins as follows:

**2.0 Introduction**

The policies provided in Volume II of the Lynn University Policy Manual apply to all members of the Lynn University community.

Volume II of the Lynn University Policy Manual has been developed to describe some of the expectations of members of the Lynn University community, as well as outline the University's community policies and programs. <u>It is intended to be used as a guideline and does not create an expressed or implied contract</u>.

ECF No. 75-1 at 52 (emphasis added).

Volume VI of Lynn's Policy Manual, entitled "Student Policies," begins as follows:

**6.0 Introduction**

Volume VI of the *Lynn University Policy Manual* contains information regarding Lynn University student policies and regulations, student services, residence life,

student rights and responsibilities, student due process, and other student life information. Academic policies appear in Volume V of the *Lynn University Policy Manual,* as well as the Lynn University Catalog. Policies pertaining to all members of the University community, including students, appear in Volume II of the *Lynn University Policy Manual*.

The provisions of this Volume VI of the *Lynn University Policy Manual* are <u>not intended as an irrevocable contract between the student and the University</u>. The University reserves the right to change any provisions or requirement, including fees, contained in this volume at any time, with or without notice.

ECF No. 75-1 at 59 (emphasis added).

Section 6.3 of Volume VI of Lynn's Policy Manual is entitled "Student Code of Conduct and Conduct Review." ECF No. 75-1 at 60. Subsection 6.3.1.8 of the Student Code of Conduct is entitled "Discrimination and Harassment" and states: "A *student* shall not engage in harassing or discriminatory behavior as defined by in the University's Non-Discrimination or Anti-Harassment Policy in Volume II of the Lynn University Policy Manual. Incidents of discrimination or harassment not involving gender will be investigated and resolved pursuant to the Non-Discrimination or Anti-Harassment Policy" which is found in Volume II. ECF No. 88-28 at 2 (emphasis added).

## **FACTS IN DISPUTE**

<u>Lynn's process for obtaining ADA accommodations</u>

Citing to excerpts of Wharton and Capiros' depositions, Defendants contend that

For students in the Institute for Achievement and Learning (IAL) in 2017, the ADA academic accommodations process involved: (1) having the student provide his/her psychological evaluation to be reviewed; (2) following review within the IAL, having the student engage in the interactive process within the IAL during which the student would need to affirmatively request ADA accommodations; and (3) submitting the student's accommodation requests through "Accommodate," Lynn University's software system, for approval.

SOF at ¶ 8.

Segev counters that "there was no clear ADA accommodations process . . . through the IAL" because "there was no written policy," and that based on their testimony, Wharton, Capiro, and Roche, "all had different understandings of the process."  ECF No. 88 at ¶ 8.[9]

Segev's psychological evaluation

Wharton testified that she first became aware of Segev's psychological evaluation on January 9, 2018, when Ms. Hyman came into her office and told her that his file had been sitting in their digital system since November.  SOF at ¶ 35 (citing ECF No. 75-3 at 6-7).  Plaintiff disputes this fact, citing Wharton's August 31, 2017 email to Antunes, which appeared to acknowledge receipt of Segev's evaluation since she confirmed that she would review it.  *See* Plaintiff's Response to Defendants' SOF at ¶ 35 (citing ECF No. 88-6).  Roche testified that the first time he learned about Segev and his request for accommodations was on "March 16, 2018, when I formally approved his accommodations and sent them to his faculty members."  *See* Roche Declaration at ¶¶ 6, 7 (ECF No. 75-6).  This fact is disputed by Wharton, who testified that she told Roche about Segev's need for accommodations on January 9, 2018.  ECF No. 75-3 at 15, 18-21.

The August 2018 meeting with Wharton

Wharton denies the testimony of Segev's mother that during their August 3, 2018 meeting, Wharton said it was a "reasonable request" that Lynn wipe clean Segev's academic record.  SOF at ¶¶ 55, 57.  By contrast, Segev contends that during the meeting with Wharton, they entered into an "in-house agreement" whereby he would not pursue litigation if Lynn agreed to erase his first

---

[9] Having reviewed the deposition testimony of Lynn's employees and administrators, I find Lynn's characterization of the procedure for obtaining ADA accommodations as a simple three-step process to be a vast over-generalization that fails to capture the complexities of the process or identify who is responsible for ensuring completion at each stage of the process.  The testimony reveals conflicting beliefs and confusion among Lynn employees regarding the process, their own duties and responsibilities, and those of their colleagues.

year from his transcript, refund his tuition and extra payment for IAL services, and allow him to start over in the Fall of 2018.  SOF at ¶ 58.

Defendants deny that "[c]onsideration was []ever offered, accepted, or discussed during the August 2018 meeting."  *Id.*  Wharton claims that she "explained to Ryan and his mother that my role in this conversation . . . would be to summarize their complaints and communicate these to the relevant decision-makers" and that she "did not have the authority to make these kind of decisions and that I was merely recording their complaints for my superiors."  ECF No. 88-8 at ¶¶ 5, 6.

<u>The applicability of Lynn's non-discrimination investigative procedures</u>

In his Additional Statement of Facts (ASOF), Segev cites excerpts of a Non-Discrimination and Anti-Harassment Policy to support his argument that Lynn did not comply with its internal procedural requirements to investigate Segev's complaint of disability discrimination.  ECF No. 88 at ¶¶ 144-153.  Defendants counter that the policies Segev cites were not in effect during the time he was enrolled as a student.  ECF No. 100 at ¶¶ 144-153.  In his sur-reply, Segev contends that "Defendants' assertion is patently false" because Defendants "cited to two provisions of the same exact policy manual and stated that it was in effect at the time of Plaintiff's enrollment." ECF No. 111 at 2.

<u>Causation</u>

The parties dispute the degree to which Lynn's failure to provide Segev with timely ADA accommodations contributed to his academic probation and dismissal.  ASOF at ¶ 101 (ECF No. 88, 100).  Defendants note that Segev missed many coaching sessions with Capiro and failed to attend at least 56 of 166 classes in the Fall 2017 semester, as well as 75 of 212 classes in the Spring 2018 semester.  SOF at ¶¶ 50-52.

## LEGAL ARGUMENTS

Defendants contend that Segev lacks Article III standing to bring his claims under Section 504 of the Rehabilitation Act and the ADA (Counts I and II). Specifically, Defendants argue that Segev's request for injunctive relief under the federal acts fails because there is "no evidence supporting a real and immediate threat of future disability discrimination" by Lynn. ECF No. 74 at 9. Defendants also contend that Segev does not have a viable claim for monetary damages under the Rehabilitation Act because he cannot demonstrate the requisite discriminatory intent.

Segev's contract-based claims (Counts III and IV) stem from (1) the alleged oral contract entered into with Defendant Wharton on behalf of Lynn on August 3, 2018, and (2) the alleged implied-in-fact contract created by Lynn's 2017-2018 Academic Catalog and Policy Manual. Defendants contend that Segev cannot establish the required elements of an oral contract and that Lynn's policies and procedures did not constitute enforceable contracts.

Defendants argue that Segev's negligence-based claims (Counts VII, IX and X) are not cognizable under Florida law because he cannot show bodily injury or property damage. Moreover, Defendants contend that the negligence claims against Wharton and Roche are duplicative of the negligence claim against Lynn and that Defendants did not owe a legal duty to Segev.

Defendants contend that Segev's claim for negligent hiring, supervising and retention (Count XI) must fail because under Florida law, any misconduct by the employee must have been committed outside the scope of their employment, and that Segev's claim for negligent training must fail because there is no underlying tort.

Lastly, Defendant Wharton argues that Segev's fraud claim and request for punitive damages (Count VI) fail as a matter of law because in Florida, allegations of fraud cannot be premised on promises of future action.  ECF No. 72 at 4-7.

## SUMMARY JUDGMENT STANDARD

The legal standard for summary judgment is well-settled:

> A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including *inter alia,* depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." A fact is material if it "might affect the outcome of the suit under the governing law." The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.
> . . .
>
> The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor.

*Rubenstein v. Fla. Bar,* 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom) (citations omitted).

## DISCUSSION

An overview of the parties' submissions reveals that there are very few undisputed material facts.  In general terms, they are as follows:  Segev sought ADA accommodations from Lynn and was entitled to receive them; Lynn failed to provide those accommodations in a timely manner; Segev was placed on academic probation and subsequently dismissed from Lynn in May 2018. Segev was permitted to re-enroll at Lynn in the Fall of 2018, but he later withdrew from the school. Nearly all of the remaining material facts are in dispute.  Thus, most of the claims in the SAC

survive Defendants' motions for summary judgment.  I will address the merits of each count in turn.

    1.   Article III Standing to Support Counts I and II

Defendants contend that Segev lacks Article III standing to bring his claims under Section 504 of the Rehabilitation Act (RA) and the ADA (Counts I and II).  To establish Article III standing,

> the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not conjectural or hypothetical." Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Burns v. Town of Palm Beach*, No. 17-CV-81152, 2018 WL 4868710, at *7 (S.D. Fla. July 13, 2018) (J. Reinhart), report and recommendation adopted, 343 F. Supp. 3d 1258 (S.D. Fla. 2018) (J. Bloom) (citations omitted).  *See also Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1147 (11th Cir. 2019) (citing *Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).

    *a.  Standing to Seek Injunctive Relief*

Defendants argue that Segev's request for injunctive relief under the ADA and RA fails because there is "no evidence supporting a real and immediate threat of future disability discrimination under either statute" by Lynn.  ECF No. 74 at 9.

A plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future."  *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any

continuing, present adverse effects." *Id.* (citations omitted). Thus, "a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer *future* discrimination by the defendant." *Houston v. Marod Supermarkets, Inc*., 733 F.3d 1323, 1334–35 (11th Cir. 2013) (citation omitted).

Here, the injury Segev alleges, and for which he seeks injunctive relief, is that his academic dismissal from Lynn and his transcript which reflects a .96 GPA "will prevent his admission into future college programs." ECF No. 89 at 2. In the SAC, Segev further alleges that Defendants' breach of their obligations under the ADA caused him to sustain, *inter alia*, "reputation damages, as well as the loss of education, career, scholarship/financial aid opportunities." ECF No. 51 at ¶ 101. In his interrogatory responses, Segev affirmed that he has been unable to receive FAFSA funding and grants due to his low GPA (ECF No. 75-10 at 6), and Segev proffers an expert report setting forth his purported future lost wages that will be incurred as a result of these deprivations. ECF No. 88-10.

The causation element – whether Segev's injury is "fairly ... trace[able]" to Lynn's failure to provide ADA accommodations in a timely manner -- is in dispute and is an issue to be decided by the factfinder. For purposes of this motion, I must view the facts in the light most favorable to Segev as the non-moving party, and in doing so, it is reasonable to infer a causal connection between the deprivation of his accommodations, his poor grades, and their impact on his future pursuits. Courts do not "require the defendant's action to be the sole source of injury," and "[c]ausation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury." *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738, 748 (9th Cir. 2020) (quoting *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) and *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014)).

As for the requested relief, Segev seeks to have his Lynn transcript amended so that it will no longer prevent him from obtaining grants/loans or deprive him of future educational/employment opportunities.  ECF No. 89 at 3.  That Segev's purported deprivation of these things will be at the hands of third parties is not fatal to his standing.  While it is true that redressability is lacking "if the injury complained of is th[e] result [of] the independent action of some third party not before the court," a plaintiff has standing when the defendant's actions produce injury through their "determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 1164, 137 L. Ed. 2d 281 (1997) (citation omitted); *see also Dep't of Commerce v. New York*, __ U.S. __, 139 S. Ct. 2551, 2566, 204 L. Ed.2d 978 (2019) (explaining that standing is present when the theory of harm "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of [the defendant's] action on the decisions of third parties").  Here, Segev's lost opportunities are a "predictable effect" of a Lynn transcript showing Segev's GPA as .96.

Defendants contend that Lynn rectified the situation by ultimately providing Segev his accommodations, and that in any event, Segev has withdrawn from Lynn and there is no evidence that he has any intent to return; thus, he cannot show a threat of future harm.  This argument misses the point.  The alleged future harm is not that Lynn might continue to discriminate against Segev by withholding ADA accommodations; it is that Segev will suffer continuing adverse effects in his education and career due to his poor transcript, which he alleges was caused by Lynn's discrimination.  An amended transcript would redress these injuries.

Notably, the "question of standing focuses on the conduct challenged in the complaint;" "[w]hether [a plaintiff] may ultimately be entitled to the requested injunctive relief is not the same question as whether [the plaintiff] has standing to seek injunctive relief."  *Puente Arizona v.*

*Arpaio*, No. CV-14-01356-PHX-DGC, 2017 WL 1133012, at *2 (D. Ariz. Mar. 27, 2017) (quoting *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 310 (E.D.N.Y. 2009)). *See also Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 85 F.Supp.3d 250, 260 (D.D.C. 2015) ("[S]tanding is assessed by considering the facts at the time the complaint was filed."). Accordingly, I find that Segev's allegations in the SAC are sufficient to confer Article III standing and allow him to pursue injunctive relief under the ADA and RA.[10]

       *b. Monetary Damages under Section 504 of the Rehabilitation Act*[11]

Couching their argument in terms of Article III standing, Defendants contend that Segev does not have a viable claim for monetary damages under the Rehabilitation Act (RA) because there is no evidence that Lynn's administrators acted with a discriminatory intent, which Segev must demonstrate by a preponderance of the evidence. ECF No. 74 at 11-15 (citing *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) and *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir .2012)). As an initial matter, I find that Segev has satisfied the elements of Article III standing to seek monetary damages. At the pleading stage he need not establish discriminatory intent to demonstrate that he has standing. Nevertheless,

---

[10]  Defendants contend that "Lynn University already offered all the relief [Segev] was seeking with respect to his transcript," but the remedy "was not accepted." ECF No. 74 at 9. I reject this argument and find a question of fact as to whether Lynn's proposal regarding amending Segev's transcript was conditioned upon Segev's acceptance of unfavorable financial terms. Moreover, Wharton's memo memorializing the August 3, 2018 meeting indicated that Segev's mother wanted her son's transcript altered to "remove W's and F's" (ECF No. 88-22 at 2), which presumably referred to withdrawals and failing grades. This is consistent with Segev's mother's deposition testimony that she wanted "Wharton to erase the entire first year." ECF No. 88-5 at 7. Notably, Lynn only offered "withdrawals for each course during the 2017-2018 Academic Year." ECF No. 88-11 at 2. Viewed in the light most favorable to Segev, the relief Segev sought was different from the relief Lynn offered, so Segev should not be precluded from pursuing his preferred relief now in the context of this lawsuit.

[11]  In his response papers, Segev does not address and appears to concede Defendants' argument that "monetary damages are not available to private litigants under Title III of the ADA unless the civil action is initiated by the Attorney General." ECF No. 74 at 10.

given the parties' extensive briefing on the issue of discriminatory intent, I will consider whether Segev's claim for compensatory damages under the RA can survive on the merits.

To establish a right to compensatory damages under § 504 of the RA, a plaintiff must prove: (1) that he is a qualified individual with a disability,[12] (2) who was excluded from participation in or denied the benefits of the defendant's services, programs, or activities, or otherwise discriminated against, (3) on account of his disability, and (4) that the exclusion or denial was the result of intentional discrimination.[13] *Martin v. Halifax Healthcare Sys.,* 621 Fed. Appx. 594, 601 (11th Cir. 2015). A plaintiff can establish intentional discrimination with evidence that the defendant was "'deliberately indifferent' to [his] rights under the ADA and the Rehab[ilitation] Act" because the defendant knew that a rights violation was "substantially likely," but "fail[ed] to act on that likelihood." *Id.* at 603–04 (citation omitted). "[D]eliberate indifference involves a 'deliberate choice'" and "[m]ere negligence is insufficient." *Id.* (quoting *Liese*, 701 F.3d at 344 and *Kelley v. Hicks*, 400 F.3d 1282, 1285 (11th Cir. 2005)).

Moreover, to hold an organization liable, the defendant's deliberate indifference must have been through "an *official* who at a minimum has *authority* to address the alleged discrimination and to institute corrective measures on the [defendant's] behalf [and who] has *actual knowledge* of discrimination in the [defendant's] programs and fails to adequately respond." *Liese*, 701 F.3d at 349 (citation omitted) (emphasis in original). In this regard, the "analysis of *what* constitutes

---

[12] Although Defendants do not concede that Segev is a qualified individual with a disability under the RA in their Answer to the SAC (ECF No. 55 at ¶ 13), Defendants do not challenge this designation in their motion papers; therefore I view Segev's disability as an uncontested fact for purposes of this motion.

[13] Similarly, Defendants' motion argues only that Segev cannot establish discriminatory intent, thus seeming to concede, for purposes of summary judgment, the existence of the first three elements of a disability discrimination claim: that Segev, as a person with a disability, was deprived of the full benefit of his classes at Lynn because of the University's failure to provide him with reasonable accommodations.

discriminatory intent . . . is inseparably linked to the question of *whose* discriminatory intent may be attributed to [an entity] for purposes of establishing liability." *Id.* at 349 (emphasis in original).

In *Liese,* the Eleventh Circuit held that

> an official is someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a "key decision point" in the administrative process. The "key decision point" language reflects the practical reality that, while some decisions are technically subject to review by a higher authority, such a review is not part of the entity's ordinary decision-making process.

*Id.* at 350 (citation omitted). *See also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (Deliberate indifference requires that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [defendant's] programs and fails adequately to respond.").

In his response papers, Segev identifies a number of employees and administrators whose failures he claims are attributable to Lynn and prove the University's deliberate indifference. Several of these individuals were unaware of the situation involving Segev and did not become involved in the matter until *after* his accommodations were granted.[14] Thus, I find that even assuming these individuals qualify as officials whose conduct is attributable to Lynn, their after-the-fact conduct, including their alleged failure to follow the University's internal investigation procedures, did not cause any of the injuries for which Segev seeks compensatory damages.

Segev's attempt to hold Lynn liable through the conduct or inaction of Wharton, Capiro and Roche also fails. The undisputed testimony reveals that, at all relevant times, neither Capiro nor Wharton had the authority to grant ADA accommodations to students. Therefore, their roles

---

[14]  Specifically, there is no evidence in the record that the following individuals knew of Lynn's failure to timely provide Segev's accommodations until after they were granted: IAL Director Shaun Exsteen, Professor Diane DiCerbo, Vice President of Academic Affairs Gregg Cox, and General Counsel Mike Antonello.

in failing to ensure that Segev received his accommodations in a timely manner do not satisfy the criteria set forth in *Liese* and thus their conduct cannot be attributed to the University.[15]

Even assuming Wharton had authority, the evidence in the record, even when viewed in the light most favorable to Segev, does not prove that her errors and omissions were motivated by a discriminatory intent or deliberate indifference.  Rather, her testimony revealed her surprise on January 9, 2018, that Segev's psychological evaluation had been sitting in the IAL computer system since mid-November, she acknowledged that she "dropped the ball" by failing to review his evaluation at that time, she immediately conducted her review and made her recommendations that same day, and went to Roche's office to admit her mistake.  These facts fail to show that Wharton's failure to timely review Segev's evaluation and recommend that his accommodations be granted was intentional discrimination rather than an unintentional oversight.

With regard to Matthew Roche, the ADA Coordinator, it is unclear whether he was an official with authority to take corrective measures.  Roche stated that although he was responsible for giving final approval of ADA recommendations, he did not work for the IAL, he had "no interactions with IAL students," and he had "no responsibility for . . . students in the IAL."  SOF

---

[15]  Segev relies on *J.S., III by & through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 984 (11th Cir. 2017) to argue that both Wharton and Capiro are officials with authority, whose deliberate indifference should be attributable to Lynn.  *J.S.* is easily distinguishable.  There, an elementary school student with severe physical disabilities and cognitive impairments was assigned a special education teacher's aide who regularly removed the student from classes without permission and allegedly verbally and physically abused him.  The district court granted the school board's summary judgment motion on the ADA and RA claims.  The Eleventh Circuit reversed in part and remanded, finding disputed issues of fact that when viewed in the light most favorable to the plaintiff could result in a reasonable jury finding that a special education teacher who had knowledge of the student's removal from the classroom and "some supervisory authority" over the aide so as to attribute liability to the school board, was deliberately indifferent in her failure to appropriately respond to the situation.  *Id.* at 990-92.  There are no such disputed issues of fact here.

at ¶ 9 (citing ECF No. 75-5 at 4, 6; ECF No. 75-6 at ¶¶ 3, 4).[16]  Nevertheless, viewing the evidence in the light most favorable to Segev, and finding that Roche did qualify as an official with authority,  the record is devoid of evidence showing that he harbored a discriminatory intent.  The only action Roche took that might be construed as deliberate indifference was his alleged delay in approving Segev's accommodations.  The testimony of Wharton and Roche differs as to when Roche was first notified that Segev's recommended ADA accommodations were ready for his approval.  Wharton testified that she told Roche on January 9, 2018.  Roche does not recall this conversation and testified that he approved Segev's accommodations on March 16, 2018, the same day he learned of them.  Despite this discrepancy, the factual dispute is not material because viewing the evidence in the light most favorable to Segev, and crediting Wharton's testimony that she notified Roche on January 9, 2018, Roche's failure to issue his final approval until two months later, standing alone, does not satisfy the high threshold of deliberate indifference.  *See Hill v. Bradley Cty. Bd. of Educ.*, No. 1:05-CV-279, 2007 WL 4124495, at *19 (E.D. Tenn. Nov. 19, 2007) (even though "there were delays in evaluating" a disabled student, it did not amount to deliberate indifference because "there was no outright refusal to evaluate and accommodate [him]"), *aff'd*, 295 F. App'x 740 (6th Cir. 2008);  *D.A. v. Houston Indep. Sch. Dist.*, 716 F. Supp. 2d 603, 615, 620 (S.D. Tex. 2009) (court found no deliberate indifference where a lack of communication led to an unnecessary two-month delay in plaintiff's special education referral), *aff'd sub nom. D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450 (5th Cir. 2010).

Indeed, there is no other evidence, even factually disputed evidence, to support Segev's claim that in delaying his approval, Roche acted with a discriminatory intent.  *Cf. Liese*, 701 F.3d at 351 (reversing trial court, appeals court found doctor was deliberately indifferent to deaf

---

[16]  Although Plaintiff attempts to dispute these facts, the testimony he relies on does not refute them.

patient's inability to read lips based on testimony that he "'laughed at' her and made exaggerated facial movements" and ignored her repeated requests for an interpreter; appeals court found deliberate indifference based on doctor's authority to obtain an interpreter, his knowledge that his patient required an additional interpretive aid to effectively communicate, and his "deliberate refusal to provide that aid").  In sum, there is nothing in the record to show that Roche knew that a harm to Segev's federally protected rights was "substantially likely," much less that he deliberately failed to act upon that likelihood.  *Martin,* 621 Fed. Appx. at 603-04.

More compelling is Segev's argument that Lynn's policies for providing ADA accommodations to IAL students were deficient and contributed to the miscommunications and procedural failings that allowed Segev's request for accommodations to be overlooked from August 30, 2017 to March 16, 2018.  The record reflects flaws at nearly every stage of the process: in the Admissions Office, the IAL, and the academic coaching department; in the receipt, transfer and review of psychological evaluations; in the procedure for ensuring accommodation recommendations were approved in a timely manner; and in transmitting information about the required accommodations to the student's professors.  Failures at each step of the process suggest that Lynn's policies, or lack thereof, were likely to result in violations of students' rights under the Rehabilitation Act.  *See Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 275 (2d Cir. 2009) (Intentional discrimination "may be inferred when a 'policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy [or] custom.'") (brackets in original) (internal quotation marks omitted).

The evidence indicates that in the Fall of 2017, there was no written policy reflecting the procedure that students and staff should follow to obtain ADA accommodations through the IAL.

ECF No. 89 at 6 (citing SOF at ¶¶ 8, 134, 135).[17]  Segev contends that "the absence of a written policy left [the process] to the discretion of employees."  ECF No. 89 at 7.

I find it was not reasonable for Lynn's administrators to assume that the University's employees had a sufficient understanding of the policies and procedures for providing ADA accommodations to students (SOF at ¶ 8), especially where there is abundant evidence to suggest that they did not.  Such willful blindness is comparable to the deliberate indifference found in *Liese*.  There, the hospital argued "that it should not be liable for the actions of its employees because it had set forth a policy for effective communications."  *Id.* 701 F.3d at 351.  The Eleventh Circuit rejected this argument, finding the hospital's "policies did not provide any guidelines, requirements, or even recommendations about when or whether the Hospital staff should provide auxiliary aids;" thus, the hospital impermissibly "delegated complete discretion to its staff."  *Id.* Even worse than the situation in *Liese*, here Lynn had no written policy in place and its administrators were not entitled to assume that the employees would properly implement a student's ADA accommodations.  *See also Ulibarri v. City & Cty. of Denver*, 742 F. Supp. 2d 1192, 1217 (D. Colo. 2010) (despite city's "efforts to train" its staff on disability issues, court found evidence sufficient for a jury to find that "these efforts are insufficient" and deliberate indifference existed because of "gaps in . . . knowledge").

In his response to Defendants' motion, Segev contends that the official responsible for Lynn's non-existent/inadequate ADA policies was Compliance Officer Lorna Fink.  Fink was Roche's supervisor and, according to Segev, was deliberately indifferent by:

---

[17]  Defendants attempt to dispute this fact by relying on Roche's testimony that "to his knowledge" there was no written policy.  ECF No. 100 at ¶ 134.  Given that Roche, as the ADA Coordinator, would likely have known if there was such a written policy, and Defendants have not produced a written policy, the evidence viewed in the light most favorable to Segev establishes that no written policy existed.

1) hiring Roche with no prior ADA training or experience and appointing him ADA Coordinator his first day at Lynn when he never applied o[r] interviewed for the position, 2) failing to adequately train Roche as he admitted not knowing how to properly read psychological evaluations for the purpose of granting ADA accommodations and had an inadequate understanding of the law and university policies; and 3) inadequately supervising Roche. Compliance Officer Fink had knowledge of Roche's inadequacies as he reported to her during annual reviews, and despite his known lack of qualifications, she allowed him to overhaul ADA policies and procedures under her supervision.

ECF No. 89 at 5-6.

Defendants do not dispute that (1) Roche never applied or interviewed for the ADA Coordinator job, and (2) he had no prior ADA training or experience when Lynn hired him for the position. *See* ASOF at 128 (ECF No. 88, 100). In addition, Roche testified that he told Fink "there was no onboarding procedure for new university hires" and that "as a new employee I wasn't onboarded, and so it was an eye-opening process for me." ECF No. 88-1 at 31. Roche told Fink that he was not trained on "how to use university software" or how to "follow processes" and that he "didn't have knowledge of all policies and procedures." *Id.*at 31, 40. According to Roche, "the HR department had a lot of turnover and so there was a lack of onboarding overall for employees." *Id.* at 31.

Roche testified that he "should have been viewed as an employee of the IAL . . . [b]ecause the work that we were doing was so intertwined . . . At times there was a lack of information sharing that I felt should have been occurring . . . I wasn't included in team meetings, so [t]here was just inherent communication challenges." *Id.* at 32-33. Roche explained that "previously the ADA coordinator was housed within the Institute for Achievement and Learning," but when Roche was hired in 2016, Lynn changed the organizational structure so that "I was no longer there [in IAL] so we had to make sure that students understood the process for applying for ADA accommodations since there was a change in process." *Id.* at 16. Notably, in September 2018,

Fink interviewed Segev's Academic Coach, Natalie Capiro, who stated her belief that "numerous procedural changes in how ADA accommodations are processed . . . could have led to the lag" in Segev receiving his accommodations.  ECF No. 88-16 at 5.

According to Fink, Lynn "continually revise[s] and update[s] [its] policies" and "all policies are reviewed through a full institutional process . . . [t]hey're also supported by outside policy consultants;" notably, however, she distinguished these "public facing ADA policies" from "internal procedure and policy."  ECF No. 88-21 at 11, 13.  Fink stated, "I only review policies . . . I don't review department internal procedures."  *Id.* at 16.  Fink testified that there were "different processes for those [students] enrolled in the IAL, and those who were not."  *Id.* at 13.  She testified that "Matthew Roche was hired in 2016, and worked diligently to update, as needed, where appropriate, [ADA] policies and procedures . . ." but that "the IAL had a set process that had worked successfully for many, many years."  *Id.* at 13, 15.

Defendants do not cite any evidence to show that Lynn employees were ever notified or instructed about the change in organizational structure or the implications to their procedures.  Thus, even though Fink was not personally aware of Lynn's failure to provide Segev with timely accommodations, she knew that there was no written policy for IAL students to receive ADA accommodations, that changes to the procedures may not have been adequately communicated to the University's employees, and that employees were not properly trained.  A jury could reasonably conclude that Fink abdicated her responsibility for supervising Roche and other employees and failed to exercise any oversight of the internal procedures designed to ensure the timely implementation of ADA accommodations.  A jury could reasonably conclude that Fink's failure to institute written internal procedures constituted deliberate indifference that is attributable to Lynn.

*Stamm v. New York City Transit Auth.*, No. 04-CV-2163 SLT JMA, 2013 WL 244793 (E.D.N.Y. Jan. 22, 2013) is instructive.  There, the New York City Transit Authority suspended its policy of requiring identification for service animals in order to comply with the ADA.  The Transit Authority "subsequently made efforts to inform their employees of the policy changes," however, as the court noted, "those efforts were not entirely effective, as evidenced by the fact that even veteran bus drivers and highly placed personnel . . . could not recall having been informed of the policy changes."  *Id.* at *4.  The plaintiff claimed that she was involved in numerous incidents in which the defendants' employees were either ignorant of the change in policy or confused about which policy to apply.  *Id.*  Several of the defendants' high-ranking officials were identified as being well-aware of the incidents, because the plaintiff complained on a regular basis.  *Id.*  The court found that, construing the evidence in a light most favorable to the plaintiff, a jury could reasonably conclude that at least one official with authority to address the alleged discrimination and to institute corrective measures had actual knowledge of ongoing discrimination against the plaintiff but failed to respond adequately.  Therefore, a reasonable jury could find the evidence adduced by the plaintiff sufficient to establish deliberate indifference. *Id. See also Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999) ("[I]ntentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned <u>policies</u> will likely result in a violation of federally protected rights.") (emphasis added).

Similarly, here, there is sufficient evidence in the record to show that Roche put Fink on notice that the training of new employees, including Roche, was non-existent/inadequate, that he was unfamiliar with the software Lynn used, and that he did not have knowledge of all of Lynn's policies and procedures.  These facts, in addition to the lack of a written procedure for ensuring

IAL students received their ADA accommodations in a timely manner, and Fink's failure to take corrective measures, are sufficient for a jury to conclude that Fink, and therefore Lynn University, was deliberately indifferent to the likelihood that their policies (or lack thereof) would result in a rights violation.  For these reasons, I find that Defendants' motion for summary judgment on Segev's claim for compensatory damages under the Rehabilitation Act (Count II) should be denied.  *See Juech v. Children's Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 784 (E.D. Wis. 2018) ("[I]f the hospital administrators were aware of the alleged problems with the VRI but demanded its use anyway [then] a reasonable finder of fact [could] conclude that the defendants were deliberately indifferent."); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989) (in § 1983 actions when the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, the policymakers can reasonably be said to have been deliberately indifferent to the need).

    2.   Segev's Contract Claims

Segev's contract-based claims in Counts III and IV stem from (1) an alleged oral contract that Segev claims was formed during the August 3, 2018 meeting with Catherine Wharton and (2) an alleged express/implied-in-fact contract created by Lynn's Academic Catalog and Policy Manual.

    *a.  The August 3, 2018 Meeting with Wharton*

"To prove the existence of a contract under Florida law, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms . . . The same requirements apply to oral contracts."  *HTC Leleu Family Tr. v. Piper Aircraft, Inc.*, 571 F. App'x 772, 776 (11th Cir. 2014) (citing *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004)).

Segev contends that an oral contract with Lynn was created as a result of his reliance on statements made during the August 3, 2018 meeting he and his mother had with Catherine Wharton. Specifically, the SAC states that at this meeting, Wharton "agreed that Defendant LYNN would erase his first year grades and credit all of the money as if started from scratch, to prevent Plaintiff RYAN SEGEV from moving forward with a lawsuit." ECF No. 51 at ¶ 70. The SAC also alleges that as a result of this meeting, Segev "believed his concerns were addressed, [so] he proceeded into the Fall 2018 semester with the belief that he would have a fresh start and his academic record would be wiped clean, and that all of his money would be refunded and applied to the upcoming school year." *Id.* at ¶ 71. Segev alleges that this agreement was violated when Lynn recorded an academic bankruptcy on his transcript, and when he was required to pay tuition for the 2018-2019 school year because "what he previously paid would no longer be credited and carry over to the new year as he was promised." *Id.* at ¶ 73.

In their initial motion papers Defendants argued that Segev "has no evidence" to support the existence of an oral contract (ECF No. 74 at 15), however, it is undisputed that "[d]uring the August 2018 meeting, [Segev's mother] made a proposal regarding wiping Plaintiff's academic record . . " SOF at ¶ 54. Thus, as Segev notes in in his response papers, "[n]either party disputes Plaintiff[] made an offer, only whether Wharton accepted the offer which is a genuine dispute of a material fact that is best left for [the] jury." ECF No. 89 at 15.

In their reply papers, Defendants argue that "[w]ithout any evidence of an offer to forego litigation during that meeting, Plaintiff has no evidence of an essential element of an oral contract: consideration." ECF No. 99 at 7. Segev, who was granted leave to file a sur-reply, counters that "it can be inferred from the context of the conversation that the [August 3, 2018] meeting took place to avoid pursuing litigation." ECF No. 112 at 2. Attached to the sur-reply are affidavits

from Segev and his mother attesting that during the August 3, 2018 meeting, Segev's mother "specifically told Catherine Wharton that she would hire an attorney if Lynn University did not remedy the situation; however, I offered to forego litigation based on the in-house agreement that we agreed upon that same day." ECF No. 112-1. These affidavits are supported by (1) an internal memorandum that Wharton prepared the same day noting her concern the University may have violated Segev's civil rights, and (2) a subsequent phone call Wharton had with Segev's mother who "outlined the numerous statutes and laws that have been disregarded and evaded in regards to the U.S. Dept of Justice Civil Rights Division." ECF No. 88-22, 88-33. Viewing this evidence in the light most favorable to Segev, I find the element of consideration is satisfied for purposes of summary judgment.

In any event, because there is a genuine dispute as to what transpired during the August 3, 2018 meeting with Wharton, and viewing the evidence in the light most favorable to Segev, I find there is sufficient evidence for a reasonable jury to conclude that an oral contract was formed and breached. Thus, I recommend that Defendants' motion for summary judgment on Segev's breach of contract claim (Count III) be denied as it pertains to the oral contract.

### b.   *Lynn's Academic Catalog and Policy Manual*

The second part of Segev's breach of contract claim finds its origins in Lynn's Academic Catalog and Policy Manual.[18]   According to Segev, Lynn's promises to provide ADA

---

[18]   To the extent Plaintiff argues for the first time in his response papers that the IAL coaching agreements and the IAL academic coaching manual constitute binding contracts, I reject this argument because these claims were not raised in the SAC. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (non-moving party plaintiff may not raise new legal claim for first time in response to opposing party's summary judgment motion). In any event, the purpose of the coaching manual is to provide "Guidelines for Weekly Coaching Sessions," and clearly does not constitute a binding contract. Moreover, it is undisputed that the coaching agreements Segev signed do not reference ADA accommodations (SOF at ¶¶ 30, 31), and I find that they are not material to any of the issues raised in this lawsuit.

accommodations to its students and to investigate instances of discrimination are set forth in a variety of university publications and documents and Lynn should be bound by them. Defendants counter that both documents specifically state that they are not to be construed as irrevocable contracts, and thus, there is no evidence of Lynn's assent to be bound since it expressly disclaimed such intent.

"Under Florida law, the legal relationship between a private university and a student is 'solely contractual in character.'" *Gibson v. Lynn Univ., Inc.*, No. 20-CIV-81173-RAR, 2020 WL 7024463, at *2 (S.D. Fla. Nov. 29, 2020) (J. Ruiz) (quoting *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 929 (11th Cir. 2013) and *Jallali v. Nova Se. Univ., Inc*., 992 So. 2d 338, 342 (Fla. Dist. Ct. App. 2008)). "It is generally accepted that the terms of that contractual relationship 'may be derived from university publications such as the student handbook and catalog.'" *Id.* (citing *Jallali*, 992 So. 2d at 342); *Orzechowitz v. Nova Se. Univ*., No. 13-62217-CIV, 2014 WL 1329890, at *3 (S.D. Fla. Mar. 31, 2014) (J. O'Sullivan) ("[A] student handbook or publication can create contractual obligations on the part of university that are not necessarily limited to the 'service' of providing a college degree."); *see also McCawley v. Universidad Carlos Albizu, Inc*., 461 F. Supp. 2d 1251, 1257 (S.D. Fla. 2006).

"The university's publications are terms of an 'implied-in-fact contract' rather than an express contract." *Gibson,* 2020 WL 7024463, at *2 (citing *Jarzynka v. St. Thomas Univ. of Law*, 310 F. Supp. 2d 1256, 1269 (S.D. Fla. 2004) (J. Lenard)). "Under Florida law, an implied-in-fact contract is 'one that is inferred in whole or in part from the parties' conduct, not solely from their words . . . A contract implied in fact is not put into promissory words with sufficient clarity, so a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement.'" *Chiron Recovery Ctr., LLC v. AmeriHealth HMO of New Jersey, Inc*., No. 9:16-CV-

82043, 2017 WL 11220686, at *5 (S.D. Fla. Dec. 12, 2017) (J. Rosenberg) (quoting *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.,* 695 So. 2d 383, 385 (Fla. Dist. Ct. App. 1997)).

Here, Segev relies on numerous provisions of Lynn's Academic Catalog and Policy Manual to show that Lynn promised to provide him with reasonable ADA accommodations, to not discriminate against him because of his disability, and to investigate complaints of discrimination. It is undisputed that Segev paid an additional fee of approximately $11,000 to receive the benefits of Lynn's IAL services.   Nevertheless, Defendants disavow any intent to be bound by the provisions contained in its publications.   Since there is a question of fact as to whether Lynn intended to be bound by any of its alleged 'promises,' a jury must interpret the parties' conduct to determine if a contract was in fact formed.   Moreover, there is a dispute as to which manuals and policies were even in effect during the time Segev was enrolled at Lynn.   These factual disputes preclude a decision in Defendants' favor as to Count III.   See *N. Palm Motors, LLC v. Gen. Motors LLC*, No. 9:19-CV-80872, 2020 WL 6381558, at *6 (S.D. Fla. Oct. 30, 2020) (J. Rosenberg) (genuine dispute of material fact as to whether there was a meeting of the minds precluded summary judgment on implied-in-fact contract); *IDEARC Media LLC v. TSG Media, Inc.,* No. 09-60531-CIV, 2010 WL 11505563, at *4 (S.D. Fla. Sept. 30, 2010) (J. Zloch) (genuine issue of material fact as to mutual assent precluding summary judgment as to whether a contract implied in fact existed).

### c.   Covenant of Good Faith and Fair Dealing

Florida courts have long held that the implied duties of good faith and fair dealing attach to virtually all contractual obligations.  *S. Miami Holdings, LLC v. Fed. Deposit Ins. Corp.*, No. 10-CV-22032-UU, 2011 WL 13220688, at *4 (S.D. Fla. Aug. 1, 2011) (J. Ungaro) (citing

*Speedway Super Am., LLC v. Tropic Ent., Inc.*, 966 So. 2d 1, 3 (Fla. Dist. Ct. App. 2007).  The implied duties of good faith and fair dealing "are intended to protect the reasonable expectations of the contracting parties."  *Id.*  The claim is usually raised "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards."  *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla. Dist. Ct. App. 2004).  A claim for breach of the implied covenant of good faith and fair dealing requires a plaintiff to identify an express term of the contract that was breached.  *Regency of Palm Beach, Inc. v. QBE Ins. Corp.*, No. 08-81442-CIV, 2009 WL 2729954, at *4 (S.D. Fla. Aug. 25, 2009) (J. Marra).  A claimant must show that the "failure or refusal to discharge contractual responsibilities [was] prompted . . . by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Tiara Condo. Ass' n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742, 747 (11th Cir.2010).

Here, Segev has identified specific provisions in Lynn's publications that he claims were breached.  Moreover, as set forth above, there is evidence from which a reasonable jury could conclude that Lynn's deliberate indifference in ensuring its disabled students received their accommodations constituted conscious and deliberate acts that frustrated the purpose of the parties' agreement.  Accordingly, I find that Defendants' motion as to Count IV should be denied.

   3.   Segev's Negligence Claims

      a.   *The Negligence Claims Against Lynn and Roche*

In the SAC, Segev alleges essentially identical negligence claims against Lynn and Roche (Counts VII and X, respectively).  Segev claims that these Defendants owed him "numerous duties" including providing him with his accommodations and complying with the obligations imposed by the University's assorted publications.  Segev contends that the acts and omissions by

Lynn employees deprived him, *inter alia*, of his right to a "discrimination free program of education," which resulted in his low GPA, academic dismissal, and academic bankruptcy.   SAC at ¶¶ 140-141.   Segev seeks compensatory and punitive damages, as well as damages for his emotional pain and suffering.

The law is well established that to bring a claim for negligence, a plaintiff must allege (1) duty, (2) breach, (3) cause, and (4) harm to the claimant.  *Perry v. Schumacher Grp. of Louisiana*, 809 F. App'x 574, 582 (11th Cir. 2020) (citing *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007)).   As a general rule, Florida courts have held that "bodily injury or property damage is an essential element of a cause of action in negligence" and "that essential element" will be waived "only under extraordinary circumstances which clearly justify judicial interference to protect a plaintiff's economic expectations."  *Perry,* 809 F. App'x at 582 (quoting *Monroe v. Sarasota Cty. Sch. Bd.*, 746 So. 2d 530, 531 (Fla. Dist. Ct. App. 1999)).   As one Florida court explained,

> From its early origins, the interest protected by a cause of action in negligence was the interest in one's person and physical property. Thus, the actual damage that was an essential element of the tort required proof of personal injury or property damage.   Over the last century, courts have occasionally expanded the tort of negligence by creating duties to protect plaintiffs in situations that do not result in personal injury or property damage. But this has occurred only when specific circumstances have warranted a more liberal judicial rule and an expanded duty of care.

*Lucarelli Pizza & Deli v. Posen Constr., Inc.*, 173 So. 3d 1092, 1094 (Fla. Dist. Ct. App. 2015).

In identifying what creates the "specific circumstances" that warrant "a more judicial rule and an expanded duty of care, Florida courts have stated,

> [W]e suspect that the <u>relationship between the plaintiff and the defendant is the critical factor</u> in determining whether a negligence cause of action exists. In negligence law, the concept of "duty" has two components: (1) the relationship that justifies placing a requirement of care upon the defendant, and (2) the general standard of care that defines the risks to be foreseen by the defendant and the level of care to be imposed upon the defendant.   Difficult economic loss cases all seem

> to examine the relationship between the parties to determine whether it warrants creating a duty to protect economic interests outside contract and statutory law.

*Tank Tech, Inc. v. Valley Tank Testing, LLC.,* 244 So. 3d 383, 393 (Fla. Dist. Ct. App. 2018) (quoting *Monroe*, 746 So. 2d at 534, n.6) (citations omitted).

Here, Segev has not alleged a special relationship between himself and Lynn or Roche. Rather, he contends that he has suffered property damage to his transcript in that Defendants have "refused to make the proper alterations to Plaintiff's transcript . . ." ECF No. 89 at 21. I find this to be a strained interpretation of the type of property damage necessary to support a negligence claim. Notably, Segev does not cite any caselaw to support his claim, and my own research has not revealed any cases where courts have permitted a similar extension of the phrase "property damage." To recover under such a theory would require that there be some physical damage to Segev's college transcript; in reality, what Segev seeks is compensation for an injury to what the transcript represents, namely, proof of his scholastic ability and performance. Segev's damages, if any, are solely economic and thus, are better suited to be remedied by his other causes of action. *See Underwriters at Interest v. All Logistics Grp., Inc.,* No. 1:19-CV-21889-KMM, 2020 WL 7051258, at *8 (S.D. Fla. May 25, 2020) (J. Moore) ("[P]urely economic risks are normally left to private bargaining, and thus, more appropriately addressed by contractual principles").

Moreover, Segev's negligence claim against Lynn is improper because it is not based on any facts that are independent from the acts and omissions that he alleges in support of his breach of contract claims. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So.2d 1238, 1239 (Fla. 1996). In asserting a negligence claim, the alleged duty cannot stem from any contractual relationship Segev had with Lynn. Justice Pariente reiterated this restriction in her concurring opinion in *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.,*

> [A] breach of contract, alone, cannot constitute a cause of action in tort . . . It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such a breach can constitute negligence.

*Tiara Condo.,* 110 So. 3d 399, 408–09 (Fla. 2013) (Pariente, J., concurring) (citing *Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. Dist. Ct. App. 1986)).  Here, there is no "additional conduct" alleged by Segev to support an independent negligence claim against Lynn.  Based on the foregoing, Defendants' motion for summary judgment as to the negligence claims against Lynn and Roche (Counts VII and X) should be granted.

b. *The Negligence Claim Against Wharton*

Segev's negligence claim against Wharton (Count IX) includes an additional theory of liability.  The SAC contends that Wharton owed Segev a duty to "not mak[e] false promises to [Segev] that she could not fulfill" and that she breached this duty "by promising to provide [Segev] a fresh slate at school, wipe his academic record clean and refund his tuition so he could start from scratch . . ." SAC at ¶¶ 149-150.  The SAC alleges that Wharton made these false representations "to avoid litigation and to entice [Segev] to enroll back into school, without having authority to execute and accomplish her promises to Plaintiff . . . [Wharton] further admitted in her Declaration that she lacked the legal authority and/or authority at the time to ensure the promises could be fulfilled and thereby had actual knowledge that her promises and/or statements were false in nature." *Id.* at ¶ 150.

Wharton contends that the claims against her are duplicative of the claims Segev has alleged against Lynn and that she cannot be held liable because she was acting within the scope of her employment.  ECF No. 72 at 8.  I reject these arguments.

First, Segev's claim that Lynn breached the oral contract he purportedly entered into during the August 3, 2018 meeting with Wharton is separate and distinct from Segev's claim that Wharton

was negligent in making misrepresentations to him, upon which he reasonably relied.  Although

both claims rely on the same the underlying facts, they are distinct legal theories that offer diverse

remedies.   Moreover, simply because Wharton was acting in the scope of her employment when

she met with Segev and his mother on August 3, 2018, she is not "shielded from personal liability

under all circumstances." *Muchnick v. Goihman*, 245 So. 3d 978, 981 (Fla. Dist. Ct. App. 2018).

> [O]fficers or agents of corporations may be individually liable in tort if they commit
> or participate in a tort, even if their acts are within the course and scope of their
> employment. All that needs to be alleged is that the agent or officer personally
> participated in the tort, even if the complained of action was because of and entirely
> within the scope of his or her employment.

*Id.* (quoting *Vesta Constr. & Design, L.L.C. v. Lotspeich & Assocs., Inc*., 974 So. 2d 1176, 1180

(Fla. Dist. Ct. App. 2008)).  Here, Wharton's personal participation in the complained of action is

undisputed.

In *Muchnick*, the defendant was a rental agent who promised the problems in an apartment

would be taken care of before the plaintiffs moved in, but the repairs were not done.  *Id.*  245 So.

3d at 981.  Even though the defendant was not the owner or landlord of the apartment, once he

made the promise to fix the problems in the apartment, "he had a duty through the undertaker's

doctrine to exercise reasonable care in making the repairs."  *Id.*  The Florida Supreme Court has

described the "undertaker's doctrine" as follows: "Whenever one undertakes to provide a service

to others, whether one does so gratuitously or by contract, the individual who undertakes to provide

the service -- i.e., the 'undertaker' -- thereby assumes a duty to act carefully and to not put others

at an undue risk of harm." *Id.* (quoting *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185

(Fla. 2003)). "The undertaker is subject to liability if: (a) he or she fails to exercise reasonable

care, which results in increased harm to the beneficiary; or (b) the beneficiary relies upon the

undertaker and is harmed as a result." *Muchnick*, 245 So. 3d at 981 (quoting *Limones v. Sch. Dist. of Lee Cty.*, 161 So. 3d 384, 388 n.3 (Fla. 2015)).

Segev has proffered sufficient evidence at this stage to show that Wharton personally undertook to correct the situation caused by him not receiving his ADA accommodations in a timely manner, and that he relied upon the alleged representations Wharton made during the August 3, 2018 meeting, which resulted in him accepting the academic bankruptcy on his transcript and re-enrolling at Lynn for the 2018-19 school year. Viewing the facts in the light most favorable to Segev, I find that Wharton assumed a duty of care when she assured Segev that the situation would be resolved in his favor. Nevertheless, I find that there are genuine factual disputes as to what Wharton promised and whether she misrepresented her ability to implement corrective measures. Thus, even though Wharton may have had no general duty to retroactively correct the problems caused by Segev not receiving his accommodations, once she "voluntarily under[took] do so . . . [she] assume[d] at least a minimal duty to exercise good judgment," and ensure that she did not mislead Segev. *Union Park Mem'l Chapel v. Hutt*, 670 So. 2d 64, 67 (Fla. 1996). Whether a person "exercised reasonable care in a given case will depend on the circumstances of that case; and, therefore, must be determined on a case-by-case basis by the trier of fact." *Id.* These facts, which must be decided by a jury, are critical to determining whether the relationship between Segev and Wharton was such that would "warrant[] creating a duty to protect [his] economic interests outside contract and statutory law." *Tank Tech, Inc.*, 244 So. 3d at 393 (quoting *Monroe*, 746 So. 2d at 534 n.6). For these reasons, I find that Defendant Wharton's motion for summary judgment on the negligence claim against her (Count IX) should be denied.

4.   <u>The Negligent Training Claim</u>

In Count XI of the SAC, Segev alleges that Lynn was negligent in its training of its employees.[19]  Negligent training occurs when an employer "was negligent in the implementation or operation of the training program."  *Gutman v. Quest Diagnostics Clinical Labs., Inc.,* 707 F. Supp. 2d 1327, 1331 n.4 (S.D. Fla. 2010) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005).  It is well settled that in Florida, the underlying wrong for a negligent training claim must be a common law tort.  *Gutman*, 707 F. Supp. 2d at 1331.  "[A] violation of the ADA . . . is not a recognized common law tort" and will not sustain a claim for negligent training.  *Id.* at 1332.  I have recommended dismissal of Segev's negligence claim against Lynn, and he has pled no other common law tort to support Count XI.  Therefore, I recommend that Lynn's motion for summary judgment on Count XI be granted.

5.   <u>The Fraud Claim Against Wharton</u>

In Count VI of the SAC, Segev alleges that Wharton "made false statements of material fact and/or intentionally mislead [Segev] when she promised to provide [him] a fresh slate at school, wipe his academic record clean and refund his tuition so he could start from scratch, to avoid litigation and to entice [Segev] to enroll back into school."  SAC at ¶ 131.  According to Segev, at the August 3, 2018 meeting, Wharton "agreed that Defendant LYNN would erase his first year grades and credit all of the money as if started from scratch, to prevent [Segev] from moving forward with a lawsuit . . . [Wharton] said that [Segev] should have no problem enrolling

---

[19]  Count XI also raises claims for negligent hiring, supervising and retention, but Plaintiff appears to have abandoned those claims, since he does not respond to Defendants' motion for summary judgment on those claims.  Accordingly, summary judgment should be entered in Defendants' favor as to those claims.  *See Mills v. NCL (Bahamas) Ltd*., No. 13-24174-CIV, 2015 WL 11201209, at *8 (S.D. Fla. Apr. 10, 2015) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.") (J. Lenard) (citation omitted).

for next semester and he should speak with his academic advisor and move forward . . . [Wharton] made these representations and promises despite having full knowledge that she did not have the authority to fulfill them." *Id.* at ¶ 132.  The SAC alleges that Wharton "made said representations with the intent of deceiving [Segev] and to entice him to enroll in classes and make payments to Defendant LYNN.  After [Segev] enrolled back into classes, he was given an academic bankruptcy which reflected on his transcript and was not credited the prior tuition he paid and was asked to pay new tuition funds." *Id.* at ¶ 135.

According to Segev, Wharton had the motivation to commit fraud to avoid having the University discover that she made a mistake in failing to conduct a timely review of Segev's psychological evaluation and recommend his ADA accommodations.  ECF No. 90 at 4.  Segev argues that at the time of the August 3, 2018 meeting, only Wharton knew that "it was her actions that exposed her employer to [this] litigation, and had the potential to expose her to discipline and/or termination." *Id.*[20]  Thus, according to Segev, "she fraudulently induced Plaintiff and his mother into relying upon [the] promises she made . . ." *Id.* at 4-5.

"[T]o allege a claim for common law fraud under Florida law, a party must set forth the following: 1) the defendant made a false statement or omission of material fact; 2) the defendant knew the statement was false; 3) the statement was made for the purpose of inducing plaintiff to rely on it; 4) plaintiff's reliance was reasonable; and 5) plaintiff suffered damages." *Balthazar Mgmt. v. Beale St. Blues Co., Inc.,* No. 17-CV-81214, 2018 WL 8221675, at *3 (S.D. Fla. Oct. 17, 2018) (J. Bloom) (quoting *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1289 (S.D. Fla. 2011) (J. Middlebrooks)).

---

[20]  Although Wharton testified that she told Roche about her mistake in January 2018, it is undisputed that in June/July 2018, Wharton replaced Roche as the ADA Coordinator and Roche's employment with the University ended.  ECF No. 75-6 at ¶ 1; ECF No. 88-8 at ¶ 3.

"The misrepresentation must be about a present or past fact rather than a future fact." *Pettinelli v. Danzig*, 722 F.2d 706, 709 (11th Cir. 1984) (citing *Cameron v. Outdoor Resorts of Am., Inc.*, 608 F.2d 187, 195 (5th Cir. 1979)). "A promise of future action or a prediction of future events does not, standing alone, constitute the necessary false representation of an existing fact for common law fraud under Florida law." *Id.* (citing *Brod v. Jernigan*, 188 So. 2d 575, 579 (Fla. Dist. Ct. App. 1966)). *See also Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1104 (11th Cir. 1983) ("A false statement amounting to a promise to do something in the future is not actionable fraud, even though the representation was made to induce another to enter into a transaction.") (citations omitted).

Nevertheless, where the defendant possesses "superior knowledge" and conveys her future "expectation" as a "representation[] of [her] present belief . . . without a factual basis," it is a negligent misrepresentation constituting common law fraud under Florida law. *Cameron*, 608 F.2d at 196.

> Florida courts recognize an exception to the rule that opinions of future events cannot be the basis for fraud, treating such opinions as facts, but only when "the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that the said person knew or should have known from facts in his or her possession that the statement was false."

*Zarrella v. Pac. Life Ins. Co*., 755 F. Supp. 2d 1218, 1224 (S.D. Fla. 2010) (quoting *Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. Dist. Ct. App. 2001) (reversing dismissal because experienced, knowledgeable real estate agent made promise regarding future events, when she knew her representations were false and never intended to perform them)). "A plaintiff seeking to recover for such a misrepresentation must show that the promisor either lacked the intention to perform the promise or specifically intended not to perform at the time the representation was made." *Royal Typewriter Co.,* 719 F.2d at 1104 (citation omitted).

Here, as the competing SOF reveal, nearly everything that was said at the August 3, 2018 meeting is in dispute, thus precluding summary judgment in Wharton's favor.  In any event, viewing the evidence in the light most favorable to Segev, I find that a reasonable jury could conclude that Wharton (1) had superior knowledge of what remedies were available to Segev, (2) assured him that she could provide the corrective measures he sought despite knowing that she lacked the authority to do so, and (3) induced Segev to rely on her misrepresentations so that he would not bring a lawsuit, would re-enroll at Lynn, and would pay additional tuition.  For these reasons, I find that Wharton's motion for summary judgment on Count VI should be denied.  *See Cruise v. Graham*, 622 So. 2d 37, 39 (Fla. Dist. Ct. App. 1993) (summary judgment was properly denied because there were genuine issues of material fact concerning the representations appellants made to appellee).

6.   Punitive Damages Against Wharton

In the SAC, Segev seeks an award of punitive damages.  In particular, Segev contends that punitive damages against Wharton are recoverable because there is clear and convincing evidence that she committed fraud.  Wharton has moved for summary judgment to dismiss Segev's claim for punitive damages against her.  The Florida Statute on punitive damages states as follows:

> (2) A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:
>
> > (a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.
> >
> > (b) "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such

conduct.

Fla. Stat. Ann. § 768.72 (West 2020).

As discussed *supra*, there is evidence in this record suggesting that Wharton knew she could not provide the remedies Segev sought and that his reliance on her statements would likely result in him suffering damages, but nevertheless she represented to him that she could wipe his transcript clean, refund his tuition, etc.  Given that I have recommended denial of Wharton's motion for summary judgment of the fraud claim in Count VI, I likewise recommend denial of her motion for summary judgment on the punitive damages claim as there are disputed issues of material fact with regard to the representations Wharton made and whether her conduct qualifies as intentional misconduct or gross negligence.  *See City of St. Petersburg v. Total Containment, Inc.*, No. 06-20953-CIV, 2008 WL 11403203, at *25 (S.D. Fla. Oct. 9, 2008) (J. Torres) (plaintiffs' fraudulent misrepresentation and punitive damages claims survived summary judgment where there were questions of fact and the evidence suggested that defendant knew of an alleged defect but marketed and sold their product to potential customers as a superior alternative, and the customers relied on defendant's representations).

## **RECOMMENDATION**

Based on the foregoing, I **RECOMMEND** that:

1.  Defendant Lynn University's Motion for Summary Judgment (ECF No. 74) be **DENIED** as to Counts I, II, III, and IV and be **GRANTED** as to Counts VII and XI;

2.  Defendant Matthew Roche's Motion for Summary Judgment (ECF No. 74) on Count X be **GRANTED**; and

3.  Defendant Catherine Wharton's Motion for Summary Judgment (ECF No. 72) on Counts VI and IX, and as to the punitive damages sought against her, be **DENIED.**

## <u>NOTICE OF RIGHT TO OBJECT</u>

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Aileen M. Cannon, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers this 26th day of February, 2021, at West Palm Beach in the Southern District of Florida.

_____

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE